The CITY OF INDIANAPOLIS, et al., Appellants–Defendants,

v.

Christine ARMOUR, et al., Appellees–Plaintiffs.

No. 49A02–0901–CV–84.

Court of Appeals of Indiana.

Dec. 18, 2009.

Rehearing Denied Feb. 17, 2010.

Jonathan L. Mayes, Justin F. Roebel, Office of Corporation Counsel, Indianapolis, IN, Attorneys for Appellants.

Ronald J. Waicukauski, R. Davy Eaglesfield, III, Jana K. Strain, Indianapolis, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE[1]

In this appeal, we are asked to determine whether a resolution ("the Resolution") passed by the Indianapolis Board of Public Works ("the Board") violates the Equal Protection Clause of the United States Constitution, as applied to forty-five property owners in Northern Estates, an Indianapolis neighborhood ("the Homeowners"). The Resolution was designed to move the City of Indianapolis (the "City") from the Barrett Law method of financing sewer projects to a different method under the Septic Tank Elimination Program ("STEP"). The Resolution forgave all Barrett Law assessments due and owing as of November 1, 2005. The Homeowners had already paid their assessments in full prior to that date, and they sought a refund equivalent to the amount the Resolution had forgiven their neighbors, who

were making installment payments. The City and the Board refused, and the Homeowners filed a complaint seeking a refund, declaratory relief, or a writ of mandamus.

The City, the Board, and other defendants (hereinafter collectively referred to as "the City," unless otherwise specified) appeal from the trial court's summary judgment for the Homeowners. The City presents two issues for our review, which we restate as the following dispositive issue: whether the Resolution, which forgave all Barrett Law assessments due and owing as of November 1, 2005, as applied to the Homeowners violated the Homeowners' right to equal protection of the laws and entitled them to a partial refund of their assessments. We hold that the City's refusal to issue a refund to the Homeowners in an amount that would place them in rough equality with their similarly situated, and identically taxed, neighbors violated the Homeowners' right to equal protection of the laws.

We affirm and remand with instructions.[2]

### FACTS AND PROCEDURAL HISTORY

The Homeowners own residential real estate in the Northern Estates neighborhood. In April of 2001, the City notified the Homeowners and other property owners in the neighborhood by letter that each of their properties would be part of a sanitary sewer project ("the project") to be funded under the Barrett Law, Indiana

---

1. We held oral argument in this case on August 19, 2009.

2. The Homeowners allege on cross-appeal that the trial court erred when it did not award them prejudgment interest. The City concedes that if the Homeowners are entitled to summary judgment on their federal constitutional claim, then prejudgment interest

should have been added to that judgment. *See* Reply at 25. Because we affirm the trial court's grant of summary judgment for the Homeowners, we likewise remand with instructions for the trial court to determine the award of prejudgment interest for the Homeowners.

Code Chapter 36–9–39. "The 'Barrett Law' ... provides the statutory process by which a municipality may provide or require public improvements." *Town Council of New Harmony v. Parker*, 726 N.E.2d 1217, 1227 n. 13 (Ind.2000). As applied here, the Barrett Law required the costs of the project to be "apportioned equally among all abutting lands or lots." Ind. Code § 36–9–39–15(b)(3).

In May of 2001, the City held a public meeting to explain the Barrett Law process, costs, proposed funding, and the design for the project. The City held another public meeting in June of 2002, and, in 2003, the Homeowners were given two opportunities to meet with members of the inspection and construction firms to discuss the project. In June of 2004, the City held a final public hearing on the project.

In July of 2004, the City assessed each property owner in Northern Estates $9,278 [3] per parcel for the project. The City gave each owner the option to pay the assessment either in a lump sum or in installments over a term of ten, twenty, or thirty years. Each of the Homeowners paid the assessment in a single, lump sum payment. The other Northern Estates property owners chose an installment payment option.

The next year, on October 31, 2005, the City of Indianapolis and Marion County City–County Council ("the City–County Council") passed Ordinance No. 107, 2005, Proposal 535 ("the Ordinance"). Under the Ordinance, which had an effective date of January 1, 2006, the City abandoned its use of the Barrett Law as a means of funding new sewer improvements and created a different financing method under STEP. According to an affidavit executed more than two years later from James A.

Garrard, the Chairperson of the Board ("the Garrard Affidavit"), "[t]he STEP program [sic] simplified utility planning, financing and operations by assessing a flat rate per sewer connection, whereas the Barrett Law program required assessment of fees based on each individual's use." Appellants' App. at 352. Under STEP, property owners adjacent to new sewer construction projects would be charged a flat $2,500 sewer-connection fee along with a monthly sewer bill. That connection fee would be paid in a single, lump sum payment by all affected property owners, although in "special cases" a property owner might qualify for a five-year installment plan. *Id.* at 4.

Following adoption of the Ordinance, on December 7, 2005, the Board passed the Resolution, which was titled, "A Resolution Forgiving Barrett Law Assessments." *Id.* at 350 (emphases removed). The Resolution stated:

WHEREAS, The Board of Public Works (Board) is authorized by Indiana Code (IC) 36–9–39 to administer 'Barrett Law Funding for Municipal Sewer' program under which the Board approves all Barrett Law projects within the City of Indianapolis–Marion County, including [an] individual assessment amount per parcel, and

WHEREAS, *The Barrett Law Funding for Municipal Sewer program may present financial hardships on many middle to lower income participants who most need sanitary sewer service in lieu of failing septic systems,* and

WHEREAS, The Department of Public Works (DPW) has a proposed rate and fee increase package to the City–County Council for approval to continue to ad-

---

3. One of the Homeowners was assessed only $4,639 because her parcel had had a previous sewer connection.

dress the re-capitalization, expansion, operation and maintenance, and regulatory requirements of the City's sanitary sewer system which was approved by the City–County Council on October 31, 2005 (Proposal No. 535 as amended) effective on January 1, 2006, and

WHEREAS, *The financial model upon which Proposal No. 535 was based, considered the current assessments being made by participants in active Barrett Law projects* as well as the future needs to eliminate leaking septic systems in all of the City of Indianapolis–Marion County in order to discontinue the use of Barrett Law Funding for Municipal Sewer program for the finance of sanitary sewers.

NOW, THEREFORE, BE IT RESOLVED that [*the Board*] *hereby forgive[s] all assessment amounts it established pursuant to the Barrett Law Funding for Municipal Sewer program due and owing from the date of November 1, 2005*[,] forward to the Department of Public Works via the Barrett Law Assessment Bureau.

*Id.* (emphases added). On May 29, 2008, the City designated the Garrard Affidavit with its cross-motion for summary judgment. In the Affidavit, Garrard offered four reasons for passing the Resolution:

a. The Board determined that the continued use of the Barrett Law funding system may present financial hardships on many middle[-]to lower-income participants who most needed sanitary sewer service in lieu of failing septic systems;

b. The Board enacted [STEP] based on several interrelated financial, engineering, public health and geographical factors so that all future installation projects would cost one flat rate per connection;

c. The City would no longer use [the] Barrett Law statute … for funding of the installation project, consequently the provisions of that statute were inapplicable, and it was essential for the City to establish a clear date for the change and move forward with the new funding approach; and

d. The administrative costs to service and process remaining balances on Barrett Law accounts long past the transition to the STEP program [sic] would not benefit the taxpayers and [would] defeat the purpose of the flat[ ]rate per connection—namely, simplifying things.

*Id.* at 353.

The Homeowners had each paid their Barrett Law assessments in full before November 1, 2005. In its operation and effect, the Resolution released 142 other Northern Estates owners who had elected to pay in installments from making any more payments as of that date. Sixty-eight of those owners had paid $309.27 toward satisfaction of the assessment; twenty-seven had paid $463.90; and forty-seven had paid $927.80.

On February 4, 2006, the Homeowners asked the Board to issue a refund of their lump sum payments in an amount equivalent to the assessments forgiven for those property owners who had paid the most under an installment plan. On March 8, 2006, Garrard sent the Homeowners a letter denying their request for refunds. The letter stated, in part, that:

The particular project area in which you reside is one of over 40 Barrett Law projects the City has constructed in the past. The circumstances of this project being constructed closer to the date in which the City chose to eliminate using Barrett Law … as a method of providing sewers to unsewered areas is one of

prioritization. We recognize that the time frame would suggest to you that refunds are warranted, but the fact that this was a recent use of Barrett Law does not distinguish it from previous projects constructed using the same funding mechanism. Refunding payments made in your project area, or any portion of the payments, would establish a precedent of unfair and inequitable treatment to all other property owners who have also paid Barrett Law assessments. *[The Board] made a decision to forgive Barrett Law assessments made after November 1, 2005[,] . . . and while this date might seem arbitrary to you, it is essential for the City to establish this date and move forward with the new funding approach.*

*Id.* at 318 (emphasis added). Thereafter, on April 27, 2007, the Homeowners each filed a claim with the Marion County Auditor for a refund of an erroneous or excessive tax payment, pursuant to Indiana Code Chapter 6–1.1–26.

On July 22, 2007, the Homeowners filed their complaint against the City seeking a Barrett Law assessment refund, declaratory relief, or, in the alternative, a writ of mandamus. Specifically, the Homeowners alleged that the City's decision not to issue a refund violated the Equal Protection Clause and the Due Process Clause of the United States Constitution[4]; Article 1, Section 23 and Article 10, Section 1 of the Indiana Constitution; and various Indiana statutes pertaining to relief for overpayment of Barrett Law assessments. The Homeowners also requested declara-

tory relief on the questions of their "right to a refund of their excess Barrett Law Assessment Payment" and whether they had properly exhausted administrative remedies against the City in seeking that refund. *Id.* at 9–10. Finally, in the event the trial court concluded that the Homeowners had not exhausted their administrative remedies, the Homeowners requested the court to issue a writ of mandamus to the Marion County Auditor, "who has refused to consider, approve or deny Plaintiffs'. . . applications for a refund." *Id.* at 11.

On March 11, 2008, the Homeowners moved for summary judgment, but only on their federal constitutional claims.[5] The Homeowners did not make any arguments under the Indiana Constitution or statutes in their motion. The City filed a cross-motion seeking a summary judgment of its own. In its motion, the City alleged that the Homeowners' federal constitutional claims must fail because the City had a rational basis for its refusal to issue refunds to the Homeowners. The City also argued that the Homeowners' state constitutional claims failed as a matter of law, and that the trial court lacked subject matter jurisdiction, both because the Homeowners had not properly exhausted their administrative remedies and had not timely filed their complaint. Following a hearing on both motions, the trial court granted the Homeowners' summary judgment motion, denied the City's motion, and entered judgment against the City in the amount of $380,914.16, including attorney's

---

**4.** The Homeowners asserted their federal constitutional challenges under 42 U.S.C. § 1983. The City does not dispute that that section of the United States Code was the proper procedural vehicle for the Homeowners to raise their constitutional claims against the City.

**5.** Although the Homeowners' motion sought summary judgment on both equal protection and due process grounds, on appeal the Homeowners abandon their due process claims and seek to have the summary judgment order affirmed only under the Equal Protection Clause.

fees. This appeal ensued.[6]

## DISCUSSION AND DECISION

### Standard of Review

The City appeals from the trial court's order on summary judgment, which granted the Homeowners' request for summary judgment on their federal constitutional claims and denied the City's motion for summary judgment. Our standard of review for summary judgment appeals is well established. *Knoebel v. Clark County Superior Court*, 901 N.E.2d 529, 531 (Ind. Ct.App.2009). An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* All doubts as to the existence of issues of material fact must be resolved against the moving party. *Id.* at 532. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* at 531–32. Where the facts are undisputed and the issue presented is a pure question of law, we review the matter *de novo*. *Crum v. City of Terre Haute ex rel. Dep't of Redev.*, 812 N.E.2d 164, 166 (Ind.Ct.App.2004). Here, the parties agree that the material facts are undisputed.

 Also well settled is our standard of review when legislation or a regulation is alleged to be unconstitutional:

Every statute stands before us clothed with the presumption of constitutionality until that presumption is clearly overcome by a contrary showing. The party challenging the constitutionality of the statute bears the burden of proof, and all doubts are resolved against that party. If two reasonable interpretations of a statute are available, one of which is constitutional and the other not, we will choose that path which permits upholding the statute because we will not presume that the legislature violated the constitution unless the unambiguous language of the statute requires that conclusion.

*Wallace v. State*, 905 N.E.2d 371, 378 (Ind. 2009) (citations and quotations omitted). In construing a city ordinance or resolution, this court uses the same methods of interpretation it applies to statutes. *See Frampton v. Hutcherson*, 784 N.E.2d 993, 996 (Ind.Ct.App.2003), *trans. denied.*

 The issue in this appeal is whether the City's refusal to issue a refund to the Homeowners violated their right to equal protection of the laws. The Homeowners have not challenged (1) the amount of the July 2004 assessment of their properties; (2) the constitutionality of the Ordinance; or (3) the facial validity of the Resolution's forgiveness provision. Rather, the Homeowners challenge the constitutionality of the forgiveness provision as applied to them. Unlike a facial challenge, an as-applied challenge "ask[s] only that the reviewing court declare the challenged statute or regulation unconstitutional on the facts of the particular case." *Dowdell v. City of Jeffersonville*, 907 N.E.2d 559, 564 (Ind.Ct.App.2009) (quoting *Sanjour v. E.P.A.*, 56 F.3d 85, 92 n. 10 (D.C.Cir. 1995)).

### Equal Protection of the Laws

 The dispositive question is whether the City's refusal to issue a re-

---

6. The trial court did not indicate that its summary judgment order was a final judgment, and, on appeal, the City states that it is appealing as a matter of right from an interlocutory order for the payment of money. *See* Ind. Appellate Rule 14(A)(1). But the court's decision on the Homeowners' federal constitutional claims rendered their requests for identical relief under the Indiana Constitution and the Indiana Code, as well as their requests for declaratory relief and a writ of mandamus, moot. Thus, the parties are appealing from a final judgment.

fund to the Homeowners in an amount equivalent to the amount forgiven similarly situated Northern Estates property owners violated the Equal Protection Clause.[7] *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Section 1 of the Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Generally speaking:

> the Fourteenth Amendment "requires that all persons subjected to ... legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *Hayes v. Missouri,* 120 U.S. 68, 71–72, 7 S.Ct. 350, 30 L.Ed. 578 (1887). When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a "rational basis for the difference in treatment."
>
> ... *Th[e] differential treatment [identified in the complaint] raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it.*

*Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, —— – ——, 128 S.Ct. 2146, 2153–54, 170 L.Ed.2d 975 (2008) (emphasis added). Further:

The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.

[T]his Court's cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.

* * *

The appropriate standard of review is whether the difference in treatment ... rationally furthers a legitimate state interest. *In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.* This standard is especially deferential in the context of classifications made by complex tax laws. In structuring internal taxation schemes the States

---

**7.** The City characterizes the Homeowners' arguments as seeking to "str[i]ke down" the entirety of the Resolution as unconstitutional. *See* Appellants' Brief at 25–28. But nowhere in the Homeowners' pleadings did they ask the trial court to strike down the Resolution, and the Homeowners do not make any such assertion on appeal. Instead, they request that the City issue them refunds equivalent to the amount forgiven other similarly situated property owners in Northern Estates.

have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.

*Nordlinger,* 505 U.S. at 10–11, 112 S.Ct. 2326 (emphasis added; citations, quotations, and alterations omitted). Thus, the level of scrutiny to be applied here is whether the City's decision rationally furthers a legitimate state interest.

The parties dispute the application of various United States Supreme Court cases to this appeal. The most relevant[8] of those cases is *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County, West Virginia,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989), in which the Supreme Court considered whether a county assessor's method of assessing property violated a landowner's equal protection rights. There, the Webster County, West Virginia, tax assessor valued recently sold real property on the basis of its recent purchase price while assessing similar property according to a previous assessment, with minor modifications. *Id.* at 338, 109 S.Ct. 633. That method of assessment ignored West Virginia law and "resulted in gross disparities in the assessed value of generally comparable property." *Id.* at 338, 345, 109 S.Ct. 633.

Writing for a unanimous Court, Chief Justice Rehnquist stated as follows:

The use of a general adjustment as a transitional substitute for an individual reappraisal violates no constitutional command. As long as general adjust-

ments are accurate enough over a short period of time to equalize the differences in proportion between the assessments of a class of property holders, the Equal Protection Clause is satisfied.... *[T]he constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners.*

*Id.* at 343, 109 S.Ct. 633 (emphasis added). The Court held that the disparate treatment by West Virginia's nonuniform application of its property tax law violated the Equal Protection Clause, noting that the "Petitioners' property has been assessed at roughly 8 to 35 times more than comparable neighboring property." *Id.* at 344, 109 S.Ct. 633. The Court also held that "the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings." *Id.* at 346, 109 S.Ct. 633. The Court then concluded that the State was required by the Constitution to refund to the complaining property owners an amount that would place them on equal footing with those property owners who benefited from the State's disparate treatment. *See id.* at 346, 109 S.Ct. 633 (citing numerous authorities).

The Supreme Court of the United States has not specifically addressed whether a municipality contravenes the Equal Protection Clause when it forgives an outstanding assessment owed by some property owners while, at the same time, it

**8.** The City relies upon *Fitzgerald v. Racing Association of Central Iowa,* 539 U.S. 103, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) and *Nordlinger.* These cases are instructive on the general principles of equal protection but differ on their facts from this case to such an extent that they are not helpful in resolving the question in this appeal. The Resolution here is not analogous to the Iowa tax law at issue in *Fitzgerald. See id.* at 108, 123 S.Ct.

2156. Nor, for the reasons discussed below, is the City's classification of the Northern Estates property owners on the basis of who did and did not have an unpaid balance on their assessment as of November 1, 2005, comparable to California's distinction in *Nordlinger* between new and older property owners. *See Nordlinger,* 505 U.S. at 12–13, 112 S.Ct. 2326.

refuses to refund an equivalent amount to similarly situated property owners who have already paid the same assessment in full. But the supreme courts of several states have addressed that exact question. We find those authorities instructive.

While there are at least three state supreme court cases directly on point, the most relevant of those cases is *Armco Steel Corp. v. Department of Treasury*, 419 Mich. 582, 358 N.W.2d 839, 843 (1984). There, the Supreme Court of Michigan held unanimously that a State agency "failed to suggest any persuasive rational basis justifying its disparate treatment of those corporate taxpayers who paid their ... assessments ... and those who did not." The *Armco Steel* Court concluded that the "relevant class to be considered in analyzing the plaintiffs' equal protection challenge" is the whole group that was assessed the tax. *Id.* The court then held that it was contrary to the Equal Protection Clause for the State agency to subdivide that class into those who timely paid and those who did not, and then forgive the unpaid assessments for the untimely taxpayers without extending a refund to the timely taxpayers. *Id.* at 843–44.

The Supreme Court of Florida and the Supreme Court of Kansas have reached similar holdings on comparable facts involving special tax concessions and the forgiveness of unpaid tax liabilities. *See Richey v. Wells*, 123 Fla. 284, 166 So. 817, 819 (1936) ("the [federal] constitutional requirement of equal protection of the tax laws prohibits the Legislature from selecting and classifying delinquent taxpayers as the beneficiaries of special tax concessions ... unless the same benefits are made equivalently available in some form or other to nondelinquent taxpayers."); *State ex rel. Stephan v. Parrish*, 257 Kan. 294, 891 P.2d 445, 457 (1995) (holding that a tax law that forgave outstanding, untimely tax liabilities without conferring an equivalent privilege on timely taxpayers was "based solely on a characteristic or status of the taxpayer" and amounted to an unconstitutional and "unreasonable grant of a tax amnesty"). Other states have reached similar conclusions under their own constitutions and without consideration of federal law. *See, e.g., State ex rel. Matteson v. Luecke*, 194 Minn. 246, 260 N.W. 206 (1935); *State ex rel. Hostetter v. Hunt*, 132 Ohio St. 568, 8 O.O. 558, 9 N.E.2d 676 (1937); *Snow's Mobile Homes, Inc. v. Morgan*, 80 Wash.2d 283, 494 P.2d 216 (1972).

In sum, the Equal Protection Clause allows broad discretion to state authorities in the creation and administration of a scheme of taxation, and a state authority's disparate treatment of similarly situated taxpayers will be found unconstitutional only if irrational, arbitrary, or capricious. *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 108, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003); *Nordlinger*, 505 U.S. at 10–11, 112 S.Ct. 2326; *Allegheny Pittsburgh*, 488 U.S. at 344, 109 S.Ct. 633. But the Constitution requires a "rough equality in tax treatment of similarly situated property owners," and similarly situated property owners must "be treated alike ... both in privileges conferred and in the liabilities imposed." *Engquist*, 128 S.Ct. at 2153; *Allegheny Pittsburgh*, 488 U.S. at 343, 109 S.Ct. 633. And, as our own Supreme Court has said, the Equal Protection Clause "does not reject the government's ability to classify persons or 'draw lines' in the creation and application of laws, but it does guarantee that those classifications will not be based on impermissible criteria or arbitrarily used to burden a group of individuals." *Lake County Clerk's Office v. Smith*, 766 N.E.2d 707, 712 (Ind.2002) (quoting *Phelps v. Sybinsky*, 736 N.E.2d 809, 818 (Ind.Ct.

App.2000), *trans. denied* ). The weight of authority holds that, for the purposes of forgiving an outstanding tax debt, a state authority acts arbitrarily when it differentiates between similarly situated, and identically assessed, taxpayers solely on the basis of those who have fully paid their debt and those who have not. *See Richey,* 166 So. at 819; *Parrish,* 891 P.2d at 457; *Armco Steel,* 358 N.W.2d at 843–44.

**Classification and Disparate Treatment**

■ There is no dispute between the parties that the July 2004 Barrett Law assessments were part of a "taxation scheme," and that the City had broad discretion to create classifications within that taxing scheme. *See Nordlinger,* 505 U.S. at 10–11, 112 S.Ct. 2326. The "relevant class to be considered in analyzing the plaintiffs' equal protection challenge" is the whole group that was assessed the tax. *Armco Steel,* 358 N.W.2d at 843; *see also Allegheny Pittsburgh,* 488 U.S. at 346, 109 S.Ct. 633 ("the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings."). Thus, the relevant classification in this case includes all the Northern Estates property owners subject to the same July 2004 Barrett Law assessment, which is the foundation for our Equal Protection Clause analysis.

Nonetheless, the City contends on appeal that the Homeowners are not similarly situated to those property owners who had not paid in full as of November 1, 2005, for two reasons. First, the City notes that the Homeowners "carried no balances requiring continued administration by the City" as of November 1, 2005. Appellants' Brief at 10. Second, the City states that the Homeowners "offer no evidence to show they were similarly situated

to the low-income families." *Id.* We address each argument in turn.

The City's first argument is not supported by legal authority. Rather, as we have already noted, the relevant classification for equal protection purposes is all the property owners in the group subject to the same July 2004 Barrett Law assessment. *See Allegheny Pittsburgh,* 488 U.S. at 346, 109 S.Ct. 633; *Armco Steel,* 358 N.W.2d at 843. The City cannot avoid an equal protection claim by subdividing the class and, in effect, re-defining the class as those who "carried no balances requiring continued administration by the City." Appellants' Brief at 10; *see Armco Steel,* 358 N.W.2d at 843–44 (holding that a state agency violated the Equal Protection Clause when it subdivided the class into who had timely paid assessments and those who had not). This attempt to re-define the relevant class not only ignores clear Supreme Court application of the Equal Protection Clause, *see Allegheny Pittsburgh,* 488 U.S. at 346, 109 S.Ct. 633, but also makes an irrational factual distinction because, under the Resolution, no further administration is required of any assessment, whether partially paid or fully paid.

Similarly, the City's second argument against including the Homeowners in the class of all Northern Estates owners subjected to the same July 2004 tax does not address the proper legal standard. The City's disparate treatment of the Homeowners indicates an arbitrary classification, and it is, therefore, the City's burden to provide a rational basis for it. *See Engquist,* 128 S.Ct. at 2153–54. But the City has wholly failed to show that the property owners who chose to pay in installments are in any different income class than the Homeowners, who paid in a single lump sum.[9] The City has not shown

9. The unstated assumption behind the City's

argument is that only low-income property

that the Homeowners are not middle- to lower-income property owners subject to the same "financial hardships" as their neighbors. As such, this argument does not present a plausible reason for disparate treatment within the class.

The fact that some of the Northern Estates property owners had paid their July 2004 assessments in full and some had not before November 1, 2005, is, unless justified by the City, an arbitrary basis for deciding who does and does not benefit from the City's amnesty and forgiveness of that debt. *See Engquist*, 128 S.Ct. at 2153–54; *Richey*, 166 So. at 819; *Parrish*, 891 P.2d at 457; *Armco Steel*, 358 N.W.2d at 843–44. All persons within the class who are similarly situated for purposes of the assessment must be subject to the same ultimate liability for collection, unless the City has a rational basis related to a legitimate state interest to treat those persons differently. *See Allegheny Pittsburgh*, 488 U.S. at 343–46, 109 S.Ct. 633. Just as the costs of the Barrett Law project were "apportioned equally among all abutting lands or lots," I.C. § 36–9–39–15(b)(3), so, too, must be the forgiveness privileges conferred upon the Northern Estates property owners.

Having determined that the relevant classification here includes all the Northern Estates property owners subject to the same July 2004 assessment, we next consider whether the City's disparate treatment of the Homeowners is "plausibl[y]" related to, and "not … attenuated" from, the Resolution's expressed policy justification. If so, we must affirm the City's decision not to issue a refund to the Homeowners. *See Nordlinger*, 505 U.S. at 11,

112 S.Ct. 2326. If, however, the policy expressed in the Resolution has no rational relation to the City's disparate treatment of the Homeowners, we must conclude that the City's disparate treatment of the Homeowners is arbitrary and unconstitutional. *See Richey*, 166 So. at 819; *Parrish*, 891 P.2d at 457; *Armco Steel*, 358 N.W.2d at 843–44.

### Rational Relation to a Legitimate Governmental Interest

To determine whether the City's disparate treatment of the Homeowners has a rational relation to a legitimate governmental interest, we consider the text of the Resolution. *See Giles v. Brown County*, 868 N.E.2d 478, 481 (Ind. 2007). "To be sure, the Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger*, 505 U.S. at 15, 112 S.Ct. 2326. But when the text of a law "specifically declare[s][its] purpose, the [law leaves] no room to conceive of any other purpose for [its] existence." *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 530, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959). And, as part of our rational-basis review, "we of course consider legislative findings," if any exist, so long as those findings may "rationally … have been considered to be true by the governmental decisionmaker." *United States v. Lopez*, 514 U.S. 549, 562–63, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (analyzing the constitutionality of a statute under the Commerce Clause); *Nordlinger*, 505 U.S. at 11, 112 S.Ct. 2326 (noting that "legisla-

---

owners paid their Barrett Law assessments in installments and that only non-low-income property owners paid in full. It was the City's burden to rebut the Homeowners' prima facie showing of disparate treatment, *see Engquist*, 128 S.Ct. at 2153–54, but the City

designated no evidence showing that the Homeowners did not include "middle to lower income participants" in the Northern Estates' Barrett Law program. *See* Appellants' App. at 350.

tive facts" may support the constitutionality of a statute under the Equal Protection Clause).

The full text of the Resolution is stated above. For purposes of our discussion, the relevant provisions are the following two "whereas" clauses:

WHEREAS, The Barrett Law Funding for Municipal Sewer program may present financial hardships on many middle to lower income participants who most need sanitary sewer service in lieu of failing septic systems, and

\* \* \*

WHEREAS, The financial model upon which Proposal No. 535 was based, considered the current assessments being made by participants in active Barrett Law projects as well as the future needs to eliminate leaking septic systems in all of the City of Indianapolis–Marion County in order to discontinue the use of Barrett Law Funding for Municipal Sewer program for the finance of sanitary sewers.

Appellants' App. at 350. The first statement in the Resolution declares that the transition from Barrett Law funding to STEP is justified to prevent undue financial hardship on middle- to lower-income families. The second statement notes that the decision to move from Barrett Law funding to STEP was based on a financial model that considered both current assessments and future needs.

The text of the Resolution identifies only one rationale for the City's decision to forgive outstanding Barrett Law assessments: the transition from Barrett Law funding to STEP is in the best interests of middle- to lower-income property owners. That is clearly a valid policy reason to transition from one funding program to another. But the Homeowners do not challenge the City's decision to move from the Barrett Law to STEP. Rather, the Homeowners challenge whether the City can apportion costs equally among similarly situated property owners and then forgive outstanding assessments on an arbitrary date without refunding an equivalent amount to those property owners who had already paid the assessment in full as of that date. As discussed above, the Homeowners' claim "raise[s] a concern" of unconstitutional treatment. *See Engquist,* 128 S.Ct. at 2153–54; *Richey,* 166 So. at 819; *Parrish,* 891 P.2d at 457; *Armco Steel,* 358 N.W.2d at 843–44. The City, having made findings and declared its purpose in the Resolution, is foreclosed from offering other subsequent explanations. *See Allied Stores,* 358 U.S. at 530, 79 S.Ct. 437 ("[when the text of a law] specifically declare[s] [its] purpose, the [law leaves] no room to conceive of any other purpose for [its] existence.").

Significantly, neither the Resolution's findings nor its forgiveness provision address the City's decisions not to issue a refund to the Homeowners. That is, the City has shown no nexus between the City's transition to STEP and its decision not to issue a refund to those Northern Estates property owners who had already paid their Barrett Law assessments in full as of November 1, 2005. Rather, there is a remarkable disconnect between those two decisions. The Resolution states that the plan to discontinue the Barrett Law method of funding considered current unpaid assessments, but the Resolution is silent with respect to any consideration given the fully paid assessments.

The close timing of the assessment in 2004 and the forgiveness in 2005 rendered even roughly equal treatment between the Homeowners and their forgiven neighbors unlikely. Again, the Equal Protection Clause does not require mathematical equality in the City's treatment of its citi-

zens but only "rough equality." *Allegheny Pittsburgh,* 488 U.S. at 343, 109 S.Ct. 633. For some of the City's forty previous Barrett Law projects, little if any outstanding liability may remain. For other projects with outstanding debt, property owners receiving forgiveness may have actually paid more than their similarly situated, unforgiven neighbors once interest is taken into account. For others still, the amount of a similarly situated neighbor's forgiven debt simply may not be enough to raise a constitutional challenge.[10] In any event, the payment status of participants in other active Barrett Law projects is speculative and not before the court. We consider one case at a time, and we leave undecided—and express no view—whether this opinion has any application to other Barrett Law participants who are not parties to this appeal. *See* Cass R. Sunstein, *One Case at a Time* (1999).

Here, the City's reasoning has failed to take into account the particular facts of the Homeowners' case. The Homeowners each paid 100% of their assessment. The other Northern Estates property owners paid between 3.33% and 10% of the identical assessment before the Resolution forgave their remaining debt. Stated another way, the Homeowners have paid from ten to thirty times more than each of their similarly situated neighbors. *See Allegheny Pittsburgh,* 488 U.S. at 344, 109 S.Ct. 633 (finding an equal protection violation where the petitioners' property had been assessed at roughly eight to thirty-five times more than comparable neighboring property). And the City forgave well over ninety percent of the total assessment against the Northern Estates residents who chose to pay by installment but gave no relief to the Homeowners.[11] If the City's financial model did not account for the return of the fully paid assessments, that failure is not a rational basis for denying the Homeowners their constitutional rights. In other words, the financial model is not a policy justification in itself but merely reflects underlying policy choices. The question is not whether the financial model supports the transition to STEP but whether the policy enacted by the City, which results in such grossly disparate treatment of the Homeowners, can withstand constitutional scrutiny.

The United States Supreme Court has also noted that a state authority's use of classifications to protect "legitimate expectation and reasonable reliance" interests provides "an exceedingly persuasive justification" for those classifications. *Nordlinger,* 505 U.S. at 13, 112 S.Ct. 2326. But, here, the Resolution is contrary to the Homeowners' legitimate expectation and reasonable reliance interests. The Homeowners had the legitimate expectation that all property owners subject to the same assessment would pay the same amount, either outright or in installments, and they reasonably relied on the City's invitation to pay their assessments in full. But rather than collecting all of an equal assessment, the City opted to collect some and to forgive the rest, distinguishing property owners within the same group only by those

---

**10.** Any of these reasons might be adequate to hold that the Resolution is constitutional on its face. But, again, the Homeowners have not raised a facial challenge to the City's forgiveness decision. Rather, the only issue the Homeowners have raised, and the only issue we are considering, is whether the City's discrimination in who does and does not receive the benefits of the forgiveness is unconstitutional as applied to these particular facts.

**11.** The total owed by the Homeowners' neighbors who elected to make installment payments was $1,317,475. Those neighbors paid a total of $77,162 in installments, which amounts to 5.9 percent of the total installment debt owed by them.

who had already paid their assessments in full by an arbitrary date.

The City's refusal to grant the Homeowners' request for a partial refund of their Barrett Law assessments violates the Equal Protection Clause. It was the City's burden to demonstrate a plausible policy reason for its disparate treatment of the Homeowners, but the City has failed to demonstrate a rational basis for the differential treatment. *See Engquist,* 128 S.Ct. at 2153–54; *Richey,* 166 So. at 819; *Parrish,* 891 P.2d at 457; *Armco Steel,* 358 N.W.2d at 843–44. Instead, the City offers attenuated justifications for its failure to treat the similarly situated Homeowners with rough equality. *See* Ind. Appellate Rule 46(A)(8)(a); *Nordlinger,* 505 U.S. at 10–11, 112 S.Ct. 2326; *Allegheny Pittsburgh,* 488 U.S. at 343–46, 109 S.Ct. 633. The City cannot lawfully confer privileges upon those property owners who chose to pay their Barrett Law assessments in installments and, at the same time, impose liabilities upon those property owners within the same class who, at the City's invitation, paid their assessments in full. *See Engquist,* 128 S.Ct. at 2153. Accordingly, we agree with the Homeowners that the Resolution's only stated policy justification—to alleviate financial hardship on middle- to lower-income property owners—bears no rational relation to the Homeowners' equal protection claim. Thus, we must affirm the trial court's grant of summary judgment to the Homeowners.

### The City's Subsequent Affidavit

In addition to the text of the Resolution, the City attempts to satisfy its burden of proof by designating the Garrard Affidavit, which was prepared for litigation, in response to the Homeowners' showing of disparate treatment. But the opinion of one Board member is not the opinion of the Board. With respect to statutes, our Supreme Court has established a clear "policy that[,] in interpreting statutes, we do not impute the opinions of one legislator, even a bill's sponsor, to the entire legislature unless those views find statutory expression." *Utility Center, Inc. v. City of Fort Wayne,* 868 N.E.2d 453, 459 (Ind.2007) (quotation, citations, and alteration omitted). We see no reason why the same rule would not apply to the interpretation of a local resolution that has the force of law.

Again, there is "no room to conceive of any other purpose for [the Resolution's] existence" beyond the purpose stated within the four corners of the Resolution. *See Allied Stores,* 358 U.S. at 530, 79 S.Ct. 437. Legislative facts may support the constitutionality of the Resolution, but only if those facts may "rationally have been considered to be true by the governmental decisionmaker." *Nordlinger,* 505 U.S. at 11, 112 S.Ct. 2326. The Garrard Affidavit is not a substitute for the Board's consideration of legislative facts in the first instance. *See Lopez,* 514 U.S. at 563 n. 4, 115 S.Ct. 1624. We cannot impute Garrard's personal opinions, which are not expressed in the language of the Resolution, to the entire Board. *See Utility Center,* 868 N.E.2d at 459. The City may not backfill with parol evidence after-the-fact. *See Allied Stores,* 358 U.S. at 530, 79 S.Ct. 437. Nevertheless, we shall briefly address the two additional arguments raised by the City under the Garrard Affidavit.[12]

---

12. The City does not advance on appeal the reason Garrard offered to the Homeowners in his March 8, 2006, letter. In that letter, Garrard stated that while the November 1, 2005, forgiveness date "might seem arbitrary" to the Homeowners, it would be "unfair and inequitable" to remit a portion of their Barrett Law payments to them and not to every other Marion County property owner who had paid the whole of a Barrett Law assess-

First, the City relies on the Garrard Affidavit to contend that the Resolution is rationally related to the City's legitimate interest in minimizing the administrative costs associated with the collection of outstanding and unpaid Barrett Law accounts. The Garrard Affidavit states that the Resolution was passed, in part, because "[t]he administrative costs to service and process remaining balances on Barrett law accounts . . . would not benefit the taxpayers." Appellants' App. at 353. But there is no evidence or suggestion that the cost to collect the outstanding and unpaid assessments from participants in active Barrett Law projects would be greater than the amount collected, a suggestion that is particularly dubious since a Barrett Law assessment constitutes a lien on the real estate assessed. *See* I.C. § 36–9–36–40. And, as we have already noted above, the City's professed concern with the costs of continued administration as a policy justification for disparate treatment is irrational because, under the Resolution, no further administration is required of any assessment, whether partially paid or fully paid. This purported justification is not a plausible policy reason for the City's disparate treatment of the Homeowners under the Equal Protection Clause. *See Nordlinger*, 505 U.S. at 10–11, 112 S.Ct. 2326; *Allied Stores*, 358 U.S. at 530, 79 S.Ct. 437.

Even if the administrative costs justification were plausible and had been expressed in the Resolution, the only course of conduct consistent with equal protection would be for the City to forgive the assessments for the whole group of property owners who were assessed, including the Homeowners, in a manner that would attain, at a minimum, rough equality within the group. *See Allegheny Pittsburgh*, 488 U.S. at 343, 109 S.Ct. 633 (holding that the Equal Protection Clause requires rough equality in the tax treatment of similarly situated property owners); *Armco Steel*, 358 N.W.2d at 843 (concluding that the "relevant class to be considered in analyzing the plaintiffs' equal protection challenge" is the whole group that was assessed the tax). As discussed above, the City did not take any steps to treat the Homeowners in a manner even roughly equivalent to their similarly situated neighbors.

Thus, the City has not shown that the Board considered administrative costs a factor when the Resolution was adopted in 2005. But most importantly, the City has not shown that its objective to avoid the cost of "continued administration" of outstanding Barrett Law accounts is plausibly related to its refusal to issue a refund check to each of the Homeowners. *See* Appellants' Brief at 10. A single payment to the Homeowners to settle their accounts would not constitute or require the "continued administration" of a "remaining balance[ ]." *See id.*; Appellants' App. at 353. There is no plausible correlation between the City's goal of minimizing administrative costs and the disparate treatment of the Homeowners under the Resolution.

Second, the City invokes the Garrard Affidavit to support its contention that the forgiveness provision is rationally related to its need for a clear line of demarcation between the two sewer-funding programs. The Garrard Affidavit sug-

ment and who had a neighbor benefiting from the forgiveness provision. Appellants' App. at 318. Because the City does not make that argument on appeal, it is waived and we do not consider it. App. R. 46(A)(8)(a). In any event, scenarios involving other Marion County property owners are not before the court, and participants in other active Barrett Law projects are not similarly situated to the Homeowners.

gests that the benefit of forgiveness received by some property owners is merely collateral to the City's primary interest in "simplifying things," namely, administration of the City's transition to STEP. *See* Appellants' App. at 353. But the City has not shown that its goal to simplify things or, as discussed above, that its transition to STEP are plausibly related to the City's refusal to issue a single refund to the Homeowners.

The Homeowners have not been treated alike in the privileges conferred upon similarly situated property owners in the Northern Estates neighborhood. *See Engquist*, 128 S.Ct. at 2153. The City has failed in its burden to demonstrate that its difference in treatment rationally furthers a legitimate state interest. *See Nordlinger*, 505 U.S. at 11, 112 S.Ct. 2326. The policy reasons and legislative facts as expressed in the Resolution bear no rational relationship to the City's exclusion of the Homeowners from the forgiveness provision. Likewise, even if we could consider the additional policy reasons proffered by the City after the fact, those reasons bear no rational relationship to the Resolution's stated goal of preventing undue financial hardship on middle- to lower-income families. Consequently, the City's differential tax treatment of the Homeowners violates the Equal Protection Clause. The trial court's judgment on that question is affirmed.

### Relief

 Finally, we briefly address the City's assertion that, "[i]f [the Homeowners] prevail, the remedy is to deny forgiveness to those taxpayers who were forgiven ..., not [to] give [the Homeowners] a refund." Appellants' Brief at 30. That position is contrary to well established equal protection law. As the United States Supreme Court has held:

A taxpayer in this situation may not be remitted by the State to the remedy of seeking to have the assessments of the undervalued property raised. "The [Equal Protection Clause] is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class." *Hillsborough*[ *v. Cromwell*, 326 U.S. 620, 623, 66 S.Ct. 445, 90 L.Ed. 358 (1946) ], citing *Sioux City Bridge Co.*[ *v. Dakota County,*] 260 U.S. [441,] 445–447, 43 S.Ct. 190, 67 L.Ed. 340 [ (1923) ]; *Iowa–Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239, 247, 52 S.Ct. 133, 76 L.Ed. 265 (1931); *Cumberland Coal Co.*[ *v. Bd. of Revision of Tax Assessments,*] 284 U.S. [23,] 28–29, 52 S.Ct. 48, 76 L.Ed. 146 [ (1931) ].

*Allegheny Pittsburgh*, 488 U.S. at 346, 109 S.Ct. 633 (first alteration original). That is, when a taxpayer is denied equal protection of the laws through a state authority's collection of assessed taxes, the proper remedy is not to penalize everyone equally but to grant the benefit given to others to the complaining taxpayer. Thus, having denied the Homeowners equal protection of the laws by granting other similarly situated property owners a benefit not conferred upon the Homeowners, the City is required by the Constitution to refund to the Homeowners an amount that will place them on equal footing with their similarly situated neighbors who benefited from the City's disparate treatment.[13] *See id.; see, e.g., Armco Steel*, 358 N.W.2d at 843–44.

---

**13.** The trial court, in its summary judgment order, determined a per person value to be refunded. The City does not challenge that valuation on appeal.

### Conclusion

On the facts of this case, and following the unanimous decision of the Supreme Court of the United States in *Allegheny Pittsburgh*, we hold that the City's disparate treatment of the Homeowners does not approach a "rough equality in tax treatment of similarly situated property owners." *See Allegheny Pittsburgh*, 488 U.S. at 343, 109 S.Ct. 633. Equality in tax treatment requires that a tax be applied uniformly among similarly situated property owners including both the assessment and the collection. Here, the relevant class is all property owners within Northern Estates who were subject to the same July 2004 Barrett Law assessment. We hold that the City has failed to demonstrate a rational relation to a legitimate state interest for discriminating against those property owners who had paid that assessment in full before the Resolution forgave all assessments due and owing from and after November 1, 2005. We also hold that, in light of the City's unconstitutional discrimination against the Homeowners, established equal protection case law entitles the Homeowners to relief through a refund.

And, like the Supreme Court of Michigan in *Armco Steel*, we conclude that the Resolution here arbitrarily creates two classes of Barrett Law property owners: those whose property was assessed and who—at the City's invitation—paid the assessment in full, and those whose property was assessed but whose assessment was forgiven because—also at the City's invitation—they opted for an installment payment plan. *See Armco Steel*, 358 N.W.2d at 843–44. The City's disparate treatment, based entirely on the chance election to pay or not to pay the assessment in full as of November 1, 2005, has no rational relation to a legitimate state interest.

Accordingly, we affirm the trial court's summary judgment for the Homeowners on their Equal Protection claim, and we affirm the court's denial of the City's motion for summary judgment. We also affirm the money judgment entered by the trial court for the Homeowners, the amount of which the City does not dispute on appeal. And we remand this case to the trial court with instructions to determine the appropriate amount of prejudgment interest to which each Homeowner is entitled.

Affirmed and remanded with instructions.

KIRSCH, J., and BARNES, J., concur.